## In the United States District Court
## for the District of Kansas

———————

Case No. 21-cv-02242-TC

———————

CHARLES BRUNNER,

*Plaintiff*

v.

GN BANK, N.A.,

*Defendant*

———————

## MEMORANDUM AND ORDER

Plaintiff Charles Brunner is a former employee of Defendant GN Bank, N.A. Brunner alleges that GN Bank terminated him in violation of federal law because of his disability, age, and sex, and retaliated against him for engaging in protected activity. Doc. 52 at ¶ 4.a.i–vi. GN Bank moves for summary judgment on all claims. Doc. 55. That motion is granted in part and denied in part.

## I

## A

**1.** Summary judgment is proper under the Federal Rules of Civil Procedure when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "'material' if it might affect the outcome of the suit under the governing law." *Janny v. Gamez*, 8 F.4th 883, 898–99 (10th Cir. 2021) (quoting *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997)). And disputes over material facts are "'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 899 (quoting *Allen*, 119 F.3d at 839). Disputes—even hotly contested ones—over facts that are not essential to the claims are irrelevant. Indeed, belaboring such disputes undermines the efficiency Rule 56 seeks to promote.

At this stage, the parties must identify material facts by reference to "pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits, if any." *Delsa Brooke Sanderson v. Wyo. Highway Patrol*, 976 F.3d 1164, 1173 (10th Cir. 2020) (citation and internal quotation marks omitted); *see also* D. Kan. R. 56.1(d). Affidavits or declarations "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on matters stated." Fed. R. Civ. P. 56(c)(4); *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1163 (10th Cir. 2021). The court "construe[s] the factual record and reasonable inferences therefrom in the light most favorable to the nonmovant." *Janny*, 8 F.4th at 899 (quoting *Allen*, 119 F.3d at 839–40). That said, the non-moving party cannot create a genuine factual dispute by making allegations that are purely conclusory, *id.*, or unsupported by the record as a whole, *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also Heard v. Dulayer*, 29 F.4th 1195, 1202 (10th Cir. 2022).

The moving party bears the initial burden of showing the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues as to those dispositive matters remain for trial. *Celotex*, 477 U.S. at 324; *Savant Homes*, 809 F.3d at 1137.

## B

Brunner's claims rely on various events and episodes over the course of his employment. The following identifies the material facts that are not in genuine dispute or, where disputed with competent evidence, viewed in the light most favorable to Brunner.

**1.** GN Bank hired Charles Brunner, then age 61, in March 2019 to work in its Hiawatha, Kansas, branch location. Doc. 60 at ¶¶ 5, 6; Doc. 63 at ¶ 58. Branch President Tom Kidwell hired Brunner. Doc. 60 at ¶ 7; *see also* Doc 60-14. Kidwell knew of Brunner's sexual orientation as a "gay male" who "does not conform to sex stereotypes" before he hired him. Doc. 60 at ¶ 10; Doc. 52 at ¶ 2.a.viii. Kidwell did not know, however, that Brunner has a "neurological condition" and "has been diagnosed with migraines." Doc. 52 at 3; Doc. 56-3 at 15.

Brunner's banking experience and community connections made him an attractive candidate to work at GN Bank. Doc. 56-2 at 2–3. Brunner previously worked at Citizens State Bank, "the only locally-owned bank in Hiawatha," where he became proficient with the teller

side of the banking software Jack Henry. Doc. 60-2 at 3. GN Bank told
Brunner it wanted to hire him because of his Hiawatha community
connections. *Id.* at 2.

GN Bank hired Brunner as a CRS, shorthand for Customer Rela-
tionship Specialist, but gave him additional responsibilities because of
his knowledge and relationships in the community. Doc. 63 at ¶ P58;
Doc. 56-3 at 49. The CRS job involves overseeing and opening new
accounts, performing teller duties when required, and providing cus-
tomer service. Doc. 60-16. Brunner was also expected to train tellers
to use software, support the Teller Supervisor, and attract new cus-
tomers. *See* Doc. 56-2 at 21–25. He was further asked to be "the public
face of the bank," and he solicited his former customers at Citizens
State Bank. Doc. 60-2 at 3. Presumably as a result of these additional
expectations, Brunner received higher compensation than other em-
ployees with the CRS title. Doc. 60 at ¶ 13.

**2.** About five months after he was hired, Brunner experienced a
medical emergency while at work. Connie Mathewson, a Vice Presi-
dent at GN Bank, took him to the emergency room. Doc. 63 at ¶¶ P3,
P6. During this episode, Brunner had trouble communicating. *Id.* at
¶ P19. Mathewson shared updates on Brunner's status with bank per-
sonnel, Doc. 60-41 at 7–8, and both Kidwell and Troy Boswell, an-
other of the branch's Vice Presidents, personally expressed their sup-
port. Doc. 60-55; Doc. 60-12 at 1. Brunner later told Kidwell, Mathew-
son, and Boswell that he had experienced a "neurological event of un-
determined cause." Doc. 60-55; *see also* Doc. 63 at ¶¶ P15–P16. A few
weeks after the first incident, Brunner visited the hospital again with
similar symptoms. Doc. 60-41 at 13, 22, 24. Brunner missed seven days
of work in August, corresponding with the dates of his hospital visits.
Doc. 60-41 at 1.

After the two August 2019 episodes, Brunner periodically experi-
enced trouble speaking. In September 2019, for example, Mathewson
texted Brunner to request a phone call, and Brunner replied that at that
moment he was "not able to get [his] words out properly" and that this
symptom "comes and goes." Doc. 60-37 at 1–2; Doc. 63 at ¶ 7. An-
other time, Kidwell visited Brunner in his office and witnessed an in-
stance where he "couldn't hardly speak." Doc. 63 at ¶ P10. Boswell
also observed Brunner's speech troubles on two or three occasions. *Id.*
at ¶ P13. Brunner missed two more days of work in late October, re-
porting to Boswell that he felt unwell. Doc. 60-41 at 43. He returned
the next day, but left early, experiencing speech-related issues. Doc. 63
at ¶ P8; Doc. 60-38 at 1–2.

**3.** Much of the parties' dispute concerns GN Bank's periodic reviews that it provides to its employees. Generally speaking, the performance appraisal focuses on three categories of output: Production, Service, and Effectiveness. Doc. 60 at ¶ 16; *see also* Doc. 56-3. Within each of those categories are several performance criteria that are graded on a 5-point, ascending scale. Doc. 56-3. For example, a score of 1 indicates the employee does not meet expectations, a 3 indicates the employee consistently meets expectations, and a score of 5 indicates the employee consistently exceeds expectations. The scores for each of these three categories are added together to obtain a "Total Value Score" and also averaged to evaluate the employee on a "Scale Rating." Doc. 56-3.

GN Bank provided performances reviews to Brunner on two occasions. He did not fare well in either, but the second one was worse than the first. Brunner's first performance review occurred in October 2019. Doc. 60 at ¶ 16. He received a Total Value Score of 8.67 (out of a possible 15) and a Scale Rating, or average score, of 2.9, which was close to meeting the company's expectations. *Id.* Brunner excelled in customer service but received poor marks in "adhering to policies and procedures within the scope of his authority," "maintain[ing] effective knowledge of Bank products and services," meeting deadlines, taking initiative, and "[m]aintaining a good attendance record." Doc. 56-2 at 21–22.

Kidwell added comments to the review. He said, "I am having concerns [that] some of the job duties are not getting done. Need to get a list together of what is expected of you. Not sure whether you are aware of items that are of concern. You have a lot of contacts and seem to get along great with our customers." Doc. 60 at ¶ 17. The review further set goals for Brunner to call deposit customers, take initiative to train staff on the Jack Henry software, learn what jobs would be expected of him, answer the phone when needed, and assist other employees without being asked. Doc. 56-2 at 22.

Brunner continued to miss work in January and February 2020 for health issues. Doc. 60-41 at 1–3. He missed 10 days of work in January, but none of these absences apparently involved his migraines or neurological symptoms. *Id.*[1] In February, Brunner missed five more days.

---

[1] Brunner supplies personal and office messages he sent to staff members these days alerting them that he was taking time off. But Brunner does not state in any of the January messages that he was experiencing a migraine or neurological episode. *See* Doc. 60-41 at 44, 46, 47, 50–52.

His timesheet indicates that he was out one of those days for a migraine, but no records show that he was out for a migraine or neurological issues the other four days. *Id.* at 2–3; *see also* Doc. 60-41 at 46.

Brunner's increasing absences began to cause friction at the bank. In late February 2020, Mathewson messaged Sheryll Callison, the Human Resources manager, to get her input on Brunner's upcoming review. Doc. 60 at ¶ P53. She asked her to read over it, saying, "I know [Kidwell] is frustrated (as we all are) with the absences, but I also know he has to be very careful in how he says that. Sometimes I worry a bit about [Kidwell's] 'delivery.'" *Id.*

On February 24, 2020, Brunner reported through GN Bank's annual Harassment and Discrimination Survey that he had been discriminated against at work "because of National Origin, Disability, Race, Sex, Color, Religion, Age, Retaliation, or other reason." Doc. 60 at ¶ 26; Doc. 56-2 at 26. Brunner identified two instances of comments made by a co-worker, Morgan Pralle, that he believed created a "poisonous atmosphere." Doc. 60 at ¶ 27. The first occurred on or around October 22, 2019, when Pralle commented to a co-worker (not Brunner) that another co-worker's dog was "gay for the stay." Doc. 52 at ¶ 3.a.; Doc. 60 at ¶ 18; *see also* Doc. 56-4 at 4–5. Even though Brunner did not hear Pralle make the comment, Pralle "immediately apologize[d]" to Brunner for her untoward remark. Doc 52 at ¶ 3.a.; Doc. 60 at ¶¶ 20, 27. The second incident happened either the next day or shortly after. Brunner said he heard from Kidwell and Mathewson that they heard Pralle make fun of his neurological episodes and say that Brunner was "too old for his job." Doc. 52 at ¶ 3.a; Doc. 60 at 22. Brunner reported that Kidwell told him that "he handled it with her," and that Pralle had become "somewhat more cordial" after Kidwell confronted her. Doc. 60 at ¶ 27.

Days later, Brunner met with Kidwell and Callison about the survey. Doc. 60 at ¶ P69. Kidwell was visibly angry and told Brunner that in all his time at the bank he had never had a discrimination complaint. *Id.* at ¶ P70. Throughout the meeting, Kidwell repeatedly held his hands up and said, "no retaliation." *Id.* at ¶ P71.

Around this same time, GN Bank was developing a work-from-home protocol due to the COVID-19 pandemic. *See* Doc. 63 at ¶ P28. In March 2020, Brunner emailed Callison to inform her of his pre-existing health conditions, including heart disease, asthma, hypertension, and a neurological disorder. *Id.*; Doc. 60-44. Two months later, Brunner emailed Callison again, restating his health issues and inquiring about "the parameters that are used to ascertain eligibility" for

working from home. Doc. 60-17. Brunner stated that he had read an article that "at-risk employees have to ask for accommodation," and voiced concern about an extended in-person interaction he had recently experienced while helping customers at the branch. *Id.* Callison told Brunner that he would have to talk to Kidwell because he was in charge of that decision. *See* Doc. 63 at ¶ P31.

Later that day, Kidwell privately messaged Mathewson that he was "not planning on granting [Brunner] rights to work from home." Doc. 63 at ¶ P33. He said there were "good reasons for that and some we cannot talk about to him." *Id.* Mathewson agreed that Brunner should not be permitted to work from home because "his job has always been to support and work alongside [the teller supervisor] while she is out" and "he needs to be there." *Id.* at ¶ P38.

Between March and May 2020, Brunner missed additional days of work, nearly all of which were for migraines. Doc. 60-41 at 3–4. Brunner missed one day in March for a migraine and three days in April. *Id.* at 3. He missed another two days in May for migraines and left early on May 14 after reporting to Kidwell that he was experiencing tremors and difficulty speaking. *Id.*; Doc. 63 at ¶ P8.

The second performance review occurred in May 2020. Doc. 60 at ¶ 34. Brunner received a Total Value Score of 7.67 and an average Scale Rating of 2.6, underperforming his previous review. *Id.* at ¶ 35. Brunner's total Performance score dropped nearly an entire point value from his first review. Doc. 56-2 at 23. Among his worst scores were being willing to assume new responsibilities and "[t]ak[ing] ownership of customers & support related issue[s] by promised dates and deadlines." *Id.* He received another unsatisfactory score for his absences. *Id.*

Kidwell's comments on the annual review reflected the disappointing performance. For instance, he identified that Brunner was not performing aspects of the job description as expected, showed low productivity, and lacked knowledge with the teller systems. Doc. 60 at ¶ 36; Doc. 56-2 at 24. The review expanded on Brunner's six-month goals, asking him to take a more prominent support role in the teller area, grow his knowledge of bank products, and take initiative to lead and assist other staff. Doc. 60 at ¶ 37; Doc. 56-2 at 24. Brunner was also charged with "[d]evelop[ing] a program to target customers . . . to call on." Doc. 56-2 at 24.

After the annual review, GN Bank placed Brunner on a Performance Improvement Plan. Doc. 60 at ¶ 38. The Improvement Plan set

three categories of goals: Teller Supervisor Support, Lobby and Teller Support, and Excessive Absences. *Id.* at ¶ 39. The first goal instructed Brunner to supervise the tellers and work the Teller Supervisor's schedule should she be absent. *Id.* at ¶ 40. The second goal required Brunner to do more to support teller staff, including quickly addressing phone calls and waiting customers, opening all new accounts at the drive-up window the next month, arranging customer documents for signature, and working at least two hours per day in the teller area if there were absences. *Id.* at ¶ 41. The third goal noted that Brunner must have his absences approved by the Branch President, instructed him to review the schedule and attendance policies, and admonished him to work his full scheduled time. *Id.* at ¶ 42. The Plan established a one-month probation period, Doc. 63 at ¶ P94, and warned that "if immediate improvement is not made, further disciplinary action may result, up to and including termination," Doc. 60 at ¶ 39.

The same month Brunner was put on the Personal Improvement Plan, Kidwell said he needed to get some "young blood" into the bank. Doc. 60 at ¶ P56. In June 2020, Kidwell hired Reed Lobdell, age 22, to work as a credit analyst between the bank's Horton and Hiawatha branches. *Id.* at ¶ P63; Doc. 60-2 at 12. Lobdell also performed some teller work at the Hiawatha branch and helped with opening new accounts when needed. *See* Doc. 60-2 at 12. That month, GN Bank also hired Marcala Chadwell, age 25, as a CRS, the same job title that Brunner held. Doc. 60 at ¶¶ P59–P60.

Boswell supervised Brunner during his 30-day probation, keeping notes of his own observations and the reports of other staff members. Doc. 60 at ¶¶ P77–P80. In July 2020, Boswell told Brunner that he was meeting expectations and "[r]ecommended he continue to be active and step forward to fulfill job description duties before being asked." *Id.* at ¶ P95. According to Brunner, Boswell told him, "You've done everything that was requested of you and more and I believe the entire thing . . . was nothing but a bunch of bullshit." *Id.* at ¶ P96. Boswell scheduled a 60-day follow up. *Id.* at ¶ P95.

After his meeting with Boswell, Brunner experienced additional health issues. He went home early on July 14 with a migraine, Doc. 60-41 at 4, and had another neurological episode the next day, resulting in another hospital visit, Doc. 60-39. After learning of the episode, Kidwell messaged Mathewson over the company messaging platform, stating, "I do feel sorry for him. I think he may be a pretty sick man with things getting worse as he ages." Doc. 60-40 at 2. Brunner went home with another migraine on August 10. Doc. 60-41 at 4.

**4.** Despite being satisfied with the improvements in Brunner's performance through early July, Boswell identified more performance failures in August and September. In early August, staff reported to Boswell that Brunner failed to perform account updates and prepare paperwork for a major account, requiring other staff members to complete the work even though the account was Brunner's responsibility. Doc. 60-22 at 4. On August 18, staff reported that Brunner closed a customer's debit card even though the customer requested only a temporary hold. *Id.* And on September 1, Tammy Shefferd, another CRS, Doc. 56-6 at 6, met with Kidwell and Boswell to tell them that she had "been doing cleanup on all [of Brunner's] accounts for some time," Doc. 60-22 at 5. According to Shefferd, she had to modify and finalize the accounts Brunner opened, "fixing the necessary documents to satisfy compliance and internal review." *Id.* Moreover, she reported that Brunner would help new customers open accounts, but after "5 minutes" he would redirect the customer to her "to finish up, which means do it all." *Id.* Boswell also reported a complaint from Tammie Sisk, another staff member, that Brunner failed to assist in the teller area during a high-volume time, even though he acknowledged her request to do so. *Id.*

After receiving Shefferd's and Sisk's complaints, Kidwell contacted Mark Schifferdecker, GN Bank's President and CEO, and suggested the bank eliminate Brunner's position. Doc. 60-29 at 1–2. Kidwell informed Schifferdecker that Brunner had performed well 30 days after the Improvement Plan but that his performance had since deteriorated again. *Id.* Kidwell said he, Boswell, and Callison had spoken with the company's HR attorney, and the attorney agreed with them that eliminating the position was appropriate. *Id.* She said to "make sure . . . not [to] hire anyone to replace [Brunner]," and Kidwell agreed not to. *Id.* at 2. Kidwell told Schifferdecker, "I think by getting rid of the position it would go over better in the community rather than just telling him he is not doing the job for us that we need. I am sure he would argue and dispute that." *Id.* Schifferdecker agreed, reasoning that eliminating the position would reduce the bank's overhead "in light of the current economic situation for banks." *Id.* at 1.

On September 11, 2020, Kidwell and Boswell told Brunner the bank was eliminating his position to reduce overhead during the pandemic. Doc. 63 at ¶ 46; Doc. 60 at ¶ P76. Neither told Brunner that the decision had anything to do with his performance. Doc. 60-22 at 6. Announcing Brunner's departure, Kidwell told bank staff that Brunner was leaving because his job duties had been absorbed by a different branch of the bank. Doc. 60 at ¶ P76. Brunner initially accepted a

8

severance agreement but later exercised his right under the agreement to revoke his acceptance. Doc. 60-52 at 23.

## C

Brunner filed a charge with the Equal Employment Opportunity Commission on November 19, 2020, alleging discrimination on the basis of disability, age, and sex, as well as unlawful retaliation. Doc. 52 at ¶ 2.a.v. The EEOC issued Brunner a right-to-sue notice on February 26, 2021, and Brunner filed this case within the required 90-day window. *Id.* at ¶¶ 4.a.vi–vii.

Brunner presses two types of claims in this lawsuit.[2] First, he claims that GN Bank discriminated against him because of his disability, age, and sex in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.*; the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et seq.*; and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Doc. 52 at ¶¶ 4.a.i, iii, v. He contends that GN Bank violated the ADA when it refused to permit him to work from home during the pandemic and later terminated his employment because of absences for his migraines and neurological condition. *See id.* at ¶ 4.a.i. GN Bank violated the ADEA, Brunner argues, because Kidwell made age-related comments and hired younger employees with similar job duties prior to terminating him. *Id.* at ¶ 4.a.iii. And he contends that GN Bank violated Title VII by tolerating a co-worker's harassing sex-based comments and later terminating his employment. *Id.* at ¶ 4.a.v.

Second, Brunner claims that GN Bank retaliated against him. He alleges that GN Bank put him on a Personal Improvement Plan and then terminated him because he reported discrimination to the company. Doc. 52 at ¶¶ 4.a.ii, iv, vi. He also claims that he was retaliated against for requesting a reasonable accommodation. *Id.* at ¶ 4.a.ii. Brunner seeks various damages for his claims, including compensatory damages for emotional distress and punitive damages. *Id.* at ¶ 5.a.

GN Bank moves for summary judgment on each claim and to bar recovery of compensatory and punitive damages for certain claims. Doc. 55. That motion has been fully briefed and is ripe for resolution.

---

[2] Brunner filed a second suit against GN Bank in which he alleges discrimination under the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2611 *et seq. Brunner v. G.N. Bank, N.A.*, No. 22-cv-02127, Doc. 1.

## II

GN Bank's motion for summary judgment is granted in part and denied in part. It is granted as to Brunner's Title VII retaliation claim and to bar recovery of compensatory emotional damages and punitive damages for Brunner's ADEA discrimination claim and his ADEA and ADA retaliation claims. The motion is denied as to his ADA, ADEA, and Title VII discrimination claims, as well as his ADEA and ADA retaliation claims.

### A

Brunner contends that GN Bank violated the ADA both by terminating him because of his disability and by denying him a reasonable accommodation. Doc. 52 at ¶ 4.a.i. The ADA prevents covered employers from "discriminat[ing] against a qualified individual on the basis of disability" regarding discharge or "other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "[N]ot making reasonable accommodations to the known physical . . . limitations of an otherwise qualified individual with a disability" also constitutes actionable discrimination under the ADA. *Id.* § 12112(b)(5)(A). GN Bank moves for summary judgment as to the ADA discrimination claim on both theories. Summary judgment is denied for both.

#### 1

An ADA discrimination claim brought on circumstantial evidence proceeds through the familiar *McDonnell Douglas* burden-shifting framework.[3] *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1192 (10th Cir. 2018) (citing *McDonnell Douglas v. Green*, 411 U.S. 792 (1973)). A plaintiff bears the initial burden of showing a prima facie case, which for Brunner's ADA discrimination claim requires him to show that he was disabled within the meaning of the ADA, qualified for the job he held, and discriminated against because of his disability. *Id.* If he does so, the burden shifts to GN Bank to articulate a "legitimate nondiscriminatory reason" for taking its adverse action. *Id.* at 1193. If GN Bank satisfies its burden, then the burden returns to Brunner to show that GN

---

[3] Brunner initially argued that he had direct evidence of discrimination. Doc. 52 at ¶ 4.a.vii. At this stage of the proceedings, however, both parties agree that the *McDonnell Douglas* test is the appropriate framework. *See* Doc. 56 at 11; Doc. 60 at 49. In other words, the parties appear to agree that there is no direct evidence of discrimination.

Bank's proffered reasons were pretextual. *See, e.g., id.*; *Aubrey v. Koppes*, 975 F.3d 995, 1015 (10th Cir. 2020).

**a.** GN Bank argues that Brunner cannot establish a prima facie case for discrimination because he has not demonstrated that he is disabled or that GN Bank discriminated against him because of his claimed disability.[4] Doc. 56 at 13–26. Not so. Brunner has established a genuine factual dispute as to both of these elements.

**i.** GN Bank contends that Brunner cannot satisfy the "disability" prong of the prima facie case. Doc. 56 at 14–22. A plaintiff can establish an ADA disability in one of three ways. He or she may show "a physical or mental impairment that substantially limits one or more major life activities," "a record of such an impairment," or that he or she is "regarded as having such an impairment." 42 U.S.C. § 12102(1); *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 544 (10th Cir. 2014). The ADA, as amended by the ADA Amendments Act of 2008 (ADAAA), Pub. Law 110-325, 122 Stat. 3553, requires the term disability to "be construed in favor of broad coverage of individuals." 42 U.S.C. § 12102(4)(A). The ADAAA expanded the scope of disability to include an "impairment that is episodic or in remission . . . if it would substantially limit a major life activity when active." *Id.* § 12102(4)(D).

Although conceding Brunner's migraines and neurological condition are impairments, Doc. 56 at 14–15, GN Bank argues that there is no evidence these condition substantially limited any major life activity. Doc. 56 at 14–17. A physical impairment substantially limits a major life activity if it significantly restricts the condition, manner, or duration in which the plaintiff can perform a major life activity as compared to most people in the general population. 29 C.F.R. § 1630.2(j)(4)(i). Factors include the difficulty, effort, or time required to perform the activity; pain experienced when performing the activity; and the length of time the activity can be performed. *Id.* § 1630.2(j)(4)(ii); *see also Smothers*, 740 F.3d at 545. Under the ADA, self-care and working at one's job are major life activities. 42 U.S.C. § 12102(2)(A). Whether an impairment is substantially limiting is a question of fact. *Smothers*, 740 F.3d at 545 (citation omitted).

There is sufficient evidence for a jury to conclude that Brunner's migraines and neurological condition substantially limited his ability to

---

[4] GN Bank does not dispute that Brunner was qualified for his job. Doc. 56 at 13–24.

care for himself or work.[5] Brunner asserts that when he has a migraine, he is light sensitive, gets nauseous, vomits, and cannot think, read, or walk without vomiting. And when he has a neurological episode, he is unable to speak. Brunner's job required him to think and read in order to, among other things, open new accounts and perform teller duties, and he had to speak to provide customer service. He demonstrates that he left work sick on numerous occasions due to his migraines and on other occasions because of neurological episodes that left him struggling to speak. Viewing these facts in the light most favorable to Brunner, a reasonable jury could find that Brunner's migraines and neurological condition substantially limited his ability to care for himself or work. *See* 29 C.F.R. § 1630.2(j)(4)(i)–(ii); *Dutton v. Johnson Cnty. Bd. of Cnty. Com'rs*, 859 F. Supp. 498, 506 (D. Kan. 1994); *see also Harrington v. Hawker Beechcraft Corp.*, No. 07-1068, 2008 WL 11378896, at *8 (D. Kan. Dec. 9, 2008) (citing *Dutton*).

GN Bank argues that Brunner's prima facie case nonetheless fails because he has adduced no evidence comparing his (in)ability to work to the average person's. Doc. 56 at 16. GN Bank relies on *Pack v. Kmart Corp.*, 166 F.3d 1300 (10th Cir. 1999), which held that a plaintiff alleging a sleep disorder needed to supply evidence how his ability to sleep compared to the general populace. *Id.* at 1306. But that additional evidence was needed in the sleep deprivation context because it was difficult to determine how the plaintiff's condition differed, if at all, from the general population. *See Albert v. Smith's Food & Drug Ctrs., Inc.*, 356 F.3d 1242, 1251 n.6 (10th Cir. 2004); *see also Pack*, 166 F.3d at 1306 n.7 (emphasizing that comparator evidence was needed there because "[d]ifficulty sleeping is extremely widespread." (quoting *Colwell v. Suffolk Cnty. Police Dep't*, 158 F.3d 635, 644 (10th Cir. 1998))).

---

[5] Brunner argues that his impairments substantially limited his ability to think, read, walk, or speak, all of which are major life activities under the ADAAA. Doc. 60 at 51 (citing 42 U.S.C. § 12102(2)(A)). But he never raised these in the Pretrial Order. Instead, he alleged that his impairments limited his ability to care for himself and work, Doc. 52 at 3, both of which are also major life activities, 42 U.S.C. § 12102(2)(A). Because the Pretrial Order "controls the course of the action," only the major life activities stated there are considered. Fed. R. Civ. P. 16(d); *see also Murphy-Sims v. Owners Ins. Co.*, 947 F.3d 628, 630 (10th Cir. 2020) ("[C]laims, issues, defenses, or theories of damages not included in the pretrial order are waived . . . .") (citing *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002)).

GN Bank has not identified a similar "dearth of other evidence" of Brunner's limitations attributable to his migraine condition. *Albert*, 356 F.3d at 1251 n.6. Instead, there is evidence that Brunner's migraines make him nauseous and affect his ability to walk without throwing up and that his neurological condition disrupts his ability to speak. And GN Bank has not shown that migraines or neurological conditions are so widespread in the general population that comparator evidence would be necessary to aid the trier of fact. *See Pack*, 166 F.3d at 1306 n.7.

GN Bank further argues that Brunner's conditions could not have substantially limited his ability to work because he had a reputation for good customer service throughout his employment. Doc. 56 at 17. This argument presupposes that Brunner's impairments must have limited him continuously. But impairments that occur only episodically are still disabilities if they substantially limit a major life activity when active. 42 U.S.C. § 12102(4)(D). It is immaterial that Brunner met his job expectations on a good day with no symptoms. If his migraines and neurological condition substantially limited his ability to work on the days those conditions were active, and there is evidence that they did, that is enough for a jury to determine that Brunner was disabled. *See Aubrey v. Koppes*, 975 F.3d 995, 1006 (10th Cir. 2020); *see also Hostettler v. Coll. of Wooster*, 895 F.3d 844, 853 (6th Cir. 2018) (holding that the episodic nature of the plaintiff's panic attacks made "no difference under the ADA" because she was substantially limited in her ability to care for herself when one was active).

A jury could also find that Brunner had a "record" of disability. *Contra* Doc. 56 at 17–18. To have a record of disability, "a plaintiff must have a history of, or been misclassified as having, an impairment that substantially limited a major life activity." *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1132 (10th Cir. 2003). That standard is met only if a plaintiff actually suffered a substantially limiting impairment. *Id.* As discussed above, a jury could find that Brunner suffered substantially limiting impairments. And a jury could further find that Brunner had a history of those impairments because he informed Kidwell and other bank staff in August 2019 that he experienced neurological episodes, his time records show that he missed work for his migraines, and he informed Callison in March and May 2020 that he had a neurological condition that put him at high risk for health complications from COVID-19.

Moreover, a jury could also conclude that GN Bank regarded Brunner as disabled. *Contra* Doc. 56 at 19–22. GN Bank argues that it could not have regarded Brunner as disabled because it did not know

about his disability. *Id.* at 20–21. There is ample evidence to the contrary: Brunner told Kidwell and others at GN Bank about his neurological episode in August 2019, and Kidwell witnessed Brunner's inability to speak soon after. Brunner also reported his neurological condition to GN Bank in regard to his risk for COVID-19, and Kidwell knew about Brunner's July 2020 hospitalization for symptoms akin to his August 2019 episode.

GN Bank cites pre-ADAAA case law to argue that even if it knew about Brunner's disability, it could not have regarded him as disabled because it did not perceive that Brunner's conditions were substantially limiting. Doc. 56 at 19–22. But the ADAAA abrogated that construction of "regarded as" discrimination. Under the ADAAA, a plaintiff is regarded as having an impairment if he has been "subjected to an action prohibited by [the ADA] because of an actual or perceived physical or mental impairment *whether or not the impairment limits or is perceived to limit a major life activity.*" 42 U.S.C. § 12102(3)(A) (emphasis added). There is evidence that GN Bank perceived Brunner's impairments, so it cannot be found as a matter of law that GN Bank did not regard Brunner as disabled.

**ii.** Turning to the third element of the prima facie case, GN Bank argues that a jury could not find that disability was a determining factor in its termination decision because there was no temporal proximity between Brunner's neurological episodes and its decision to terminate his position. Doc. 56 at 22–24. This element focuses on "whether the circumstances surrounding the adverse employment action 'give rise to an inference that the [action] was based on [the plaintiff's] disability.'" *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1192–93 (10th Cir. 2018) (quoting *Smothers*, 740 F.3d at 544). A plaintiff may establish an inference of discrimination through, among other things, the "actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus," *id.* (quoting *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005)), or "upon the timing or sequence of events leading to plaintiff's termination," *Plotke*, 405 F.3d at 1101. That burden is not onerous. *Lincoln*, 900 F.3d at 1193.

The premise to GN Bank's argument is that Brunner's first neurological episode occurred in November 2019. Doc. 56 at 23. And because that episode occurred *after* the six-month review, the subsequent review and Personal Improvement Plan were related to performance issues identified in the six-month review, and could not have been related to Brunner's disability. *Id.* at 23–24. But Brunner presents evidence that his first neurological episodes and related absences occurred in August 2019, *before* the six-month review. Doc. 60 at 55 (citing *id.* at

14

¶ P3). And that review scored Brunner lower for poor attendance, which Brunner contends is directly related to his disability. Doc. 60 at 54.

Evidence of temporal proximity does not end there. Brunner took numerous sick days from January to May, all after his six-month review. His annual review in May 2020 also had a low score for attendance. And his Personal Improvement Plan contained a goal of reducing excessive absences, warning him that he could be terminated if that goal were not met. Brunner missed additional workdays in June, July, and August 2020 for migraines and his neurological condition, as close as one month before his termination. On this record, a reasonable jury could find temporal proximity between the termination decision and Brunner's health episodes.

Temporal proximity is not the only factor to consider. Brunner offers evidence of staff comments implicating his disabilities and their views on how it impacted his performance. Internal company messages show that Brunner's excessive absences were generating frustration among management, including Kidwell. And Kidwell said in July 2020 that he thought Brunner "may be a pretty sick man with things getting worse as he ages." Doc. 60 at ¶ P12. GN Bank asserts that Kidwell wrote this in sympathy, Doc. 63 at 95–96, but that is something for a jury to decide.

**b.** Because Brunner raises a genuine dispute of material fact as to the elements of his prima facie case, the burden shifts to GN Bank to offer a legitimate, nondiscriminatory reason for its termination decision. *Lincoln*, 900 F.3d at 1193. The burden to establish a legitimate, nondiscriminatory reason is "exceedingly light." *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1215 (10th Cir. 2022) (citation omitted); *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 968–69 (10th Cir. 2017). On a motion for summary judgment, a defendant need only "'articulate a reason for the [action] that is not, on its face, prohibited' and that is 'reasonably specific and clear.'" *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1058 (10th Cir. 2020) (citation omitted). It "need not persuade the court that it was actually motivated by the proffered reasons." *Tex. Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

GN Bank proffers that it eliminated Brunner's position—not him personally—because the unique position did not turn out to be advantageous to the bank. Doc. 56 at 37. GN Bank states that the position was not developing new accounts or providing support and oversight for teller staff, "which were the two primary goals" of the position. *Id.*

at ¶ 50. That reason is not facially discriminatory, and it identifies reasonably specific business reasons for taking the action. *See Frappied*, 966 F.3d at 1058.

**c.** The burden then shifts to Brunner to show that GN Bank's reason for terminating his position is pretext for discrimination. *See Lincoln*, 900 F.3d at 1193. Brunner offers numerous arguments for why GN Bank's justifications are pretextual. Doc. 60 at 67–72. Viewing the record in the light most favorable to Brunner, there is a genuine factual dispute as to whether GN Bank's proffered reason is pretext for discrimination.

A plaintiff "may show pretext by demonstrating the proffered reason is factually false, or that discrimination was a primary factor in the employer's decision." *Lincoln*, 900 F.3d at 1193 (quoting *DePaula*, 859 F.3d at 970). In other words, a plaintiff may show that the defendant's reason is "so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude [it is] unworthy of belief." *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1039 (10th Cir. 2011); *see also Bekkem*, 915 F.3d at 1267.

Pretext probes the true intentions of the defendant, so the focus is limited to "whether the employer honestly believed its reasons and acted in good faith upon them." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1119 (10th Cir. 2007). A court's role "is to prevent intentional discriminatory . . . practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." *Dewitt v. S.W. Bell Tele. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017) (quoting *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006)). All facts are examined "as they appear *to the person making the decision*, not as they appear to [the] plaintiff." *Debord v. Mercy Health Sys. of Kan., Inc.*, 737 F.3d 642, 655 (10th Cir. 2013) (citation and internal quotation marks omitted). All doubts concerning pretext are resolved in the plaintiff's favor, but conjecture and bare allegations are not enough to show pretext. *Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1267 (10th Cir. 2007).

Brunner attacks GN Bank's proffered reason on multiple fronts. Doc. 60 at 67–72. His arguments concern alleged inconsistencies in GN Bank's reasons for termination, suspicious conduct by GN Bank staff, and irregularities in the company's personnel decisions concerning Brunner. Although Brunner's personnel arguments fail to support

pretext,[6] there is a genuine factual dispute for a jury to resolve as to whether Kidwell's shifting reasons for eliminating Brunner's position and apparent obfuscations imply discrimination.

   **i.** Brunner contends that the evidence shows inconsistencies in Kidwell's deposition testimony about his reason for terminating Brunner's position. Doc. 60 at ¶ P76. Brunner was told that his position was eliminated to lower the company's overhead due to the pandemic. Kidwell admitted, however, that the termination decision "[p]robably [did] not" have anything to do with COVID-19. *Id.* Kidwell further testified that the position was eliminated because Brunner was performing his job poorly, *id.*, although he never discussed performance with Brunner during the termination meeting. Even so, Kidwell's performance-based reasons stray from the goals set by the Personal Improvement Plan. He testified that Brunner's failure to go into the community and call on new customers was part of the reason the position was eliminated, Doc. 60-4 at 5, but the Personal Improvement Plan does not address that job duty at all, *see* Doc. 56-2 at 25. Kidwell also testified that Brunner's position was eliminated because his job tasks were moved to another bank branch, which was the explanation he gave to branch staff about Brunner's departure.

   Kidwell's good-faith belief in the proffered reason is further called into question by his email to Schifferdecker. In that email, he recommends eliminating Brunner's position not because the position was no longer needed or because Brunner was not accomplishing the bank's goals but because doing so "would go over better in the community

---

[6] Assigning employees to "keep[] tabs" on Brunner does not raise an inference of pretext where his performance was actively monitored under the terms of the Improvement Plan. *See Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1324 (10th Cir. 1997). *Contra* Doc. 60 at 70. GN Bank's failure to follow its verbal warning policy when it outlined issues in written performance reviews was not a "disturbing procedural irregularity" that indicates pretext. *See Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1220 (10th Cir. 2002). *Contra* Doc. 60 at 70–71. And Boswell's comment that he thought the Improvement Plan was "nothing but . . . a bunch of bullshit," Doc. 60 at ¶ P96, is not material to determining whether Kidwell—the supervisor who was responsible for the decision—had a good faith belief based on the facts as they appeared to him at the time the decision was made, *see Debord*, 737 F.3d at 655. *Contra* Doc. 60 at 71. Furthermore, evidence that Brunner was the first employee to have been placed on an Improvement Plan or have his position eliminated does not itself indicate pretext, and questioning GN Bank's professional judgment to use an Improvement Plan or terminate a position is not the role of a federal court. *See Riggs*, 497 F.3d at 1118–19. *Contra* Doc. 60 at 72.

rather than just telling [Brunner] he is not doing the job for us that we need." Doc. 60-29 at 2. A reasonable jury could determine from Kidwell's testimony that his reasons are inconsistent or contradictory and thus unworthy of belief. *Bekkem*, 915 F.3d at 1267.

**ii.** Brunner further argues that Kidwell and GN Bank staff engaged in suspicious conduct that creates a question as to whether Kidwell's reasoning was offered in good faith. Doc. 60 at 69–70. Kidwell and his staff privately discussed matters regarding Brunner on multiple occasions over the company's messaging platform. *Id.* at ¶¶ P12, P37–P38, P43, P53. Kidwell testified, however, that he did not think he had ever communicated about Brunner on that platform. *Id.* at ¶ P75. He further believed that messages sent through that platform were not saved. *Id.* In those communications, Kidwell once stated that he could not share with Brunner some of his reasons for denying his request to work from home. *Id.* at ¶ 33. And Kidwell's communications with GN Bank's HR attorney suggest that eliminating Brunner's position could have been a contrived position to avoid legal liability. *Id.* at ¶¶ 66–67. This evidence contributes to the factual dispute as to whether Kidwell's proffered reason for his termination decision is worthy of belief.

**2**

In addition to his disparate treatment theory, Brunner contends that GN Bank discriminated against him under the ADA by failing to accommodate his disability. Doc. 52 at ¶ 4.a.i. GN Bank responds that Brunner's failure-to-accommodate claim fails as a matter of law because Brunner did not request a reasonable accommodation. Doc. 56 at 24–26. GN Bank's motion is denied because Brunner's email to Callison was enough to constitute a request for accommodation, and whether or not his request was reasonable, GN Bank failed to engage in the interactive process.

A failure-to-accommodate claim proceeds under a modified *McDonnell Douglas* burden-shifting framework. *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1204 (10th Cir. 2018). To succeed in his claim, Brunner must first make a prima facie showing that he was disabled, qualified for the job, requested a reasonable accommodation, and refused a reasonable accommodation. *Dansie v. Union Pac. R.R. Co.*, 42 F.4th 1184, 1192 (10th Cir. 2022); *Exby-Stolley v. Bd. of Cnty. Comm'rs.*, 979 F.3d 784, 795 (10th Cir. 2020). If Brunner succeeds, the burden shifts to GN Bank to either conclusively rebut one or more elements of Brunner's prima facie case or establish an affirmative defense. *Aubrey v. Koppes*, 975 F.3d 995, 1005 (10th Cir. 2020) (citation omitted). If GN Bank satisfies either, it "is entitled to summary judgment unless [Brunner]

presents evidence establishing a genuine dispute about the affirmative defenses or rehabilitates any challenged elements of h[is] prima facie case sufficiently to establish at least a genuine dispute of material fact." *Dansie*, 42 F.4th at 1193 (citation omitted).

**a.** GN Bank first argues that Brunner does not put forward a prima facie case because his email to Callison was nothing more than an inquiry into the company's work-from-home policy. Doc. 56 at 24–26. A request need not "formally invoke the magic words 'reasonable accommodation,'" but it "nonetheless must make clear that the employee wants assistance for his or her disability." *EEOC v. C.R. England*, 644 F.3d 1028, 1049 (10th Cir. 2011) (citation and emphasis omitted). In other words, an employee's request must contain "notice to the employer of his disability and any resulting limitations." *Dansie*, 42 F.4th at 1193.

Construing the facts in the light most favorable to Brunner, Brunner's May 2020 email was sufficient to request an accommodation. The email discussed both Brunner's work and his disability. He voiced concern that he was at-risk for health complications from COVID-19 due to his neurological condition, among other ailments, and that performing his job, which required being in close proximity to customers, could expose him to the virus. Brunner also offers evidence that indicates the company understood Brunner's email to contain a request—Callison testified that Brunner "asked [her] about working from home due to COVID" and she told him she would need to talk to Kidwell because she "wasn't in charge of if he was able to work from home or not." Doc. 60 at ¶ P31. On those facts, a jury could conclude that Brunner requested an accommodation.

**b.** GN Bank next argues that even if Brunner requested an accommodation, his requested accommodation was not reasonable. But GN Bank provides no analysis for why Brunner's request was not reasonable—it offers only a conclusory statement that working from home would have "eliminate[d] an essential aspect of his position." Doc. 56 at 26. More is required. *Dansie*, 42 F.4th at 1194 (recognizing the employer must present evidence of its inability to accommodate by pointing to special circumstances that "prove undue hardship in the particular situation"). GN Bank's argument is insufficient to meet its burden to show that Brunner's requested accommodation was unreasonable as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

**c.** Even assuming Brunner's requested accommodation was not reasonable, GN Bank still would not be entitled to summary judgment because it failed to engage in an interactive process. A request for an

accommodation triggers an employer's "affirmative obligation to undertake a good faith back-and-forth process" with its employee "with the goal of identifying the employee's precise limitations and attempting to find a reasonable accommodation for those limitations." *Dansie*, 42 F.4th at 1193 (quoting *Aubrey*, 975 F.3d at 1009). Even if a workable accommodation does not exist, "the ADA mandates that the employer work with the employee to try to find one." *Id.* (citation omitted). Failure to engage in the interactive process often precludes summary judgment for the employer because without that, it is "not likely that an employer will be able to establish . . . the absence of a disputed fact as to the existence of a reasonable accommodation." *Aubrey*, 975 F.3d at 1009.

GN Bank does not argue that there was no reasonable accommodation it could offer Brunner, only that Brunner's purported requested accommodation was not reasonable. *See* Doc. 56 at 26. The law requires more. *See Dansie*, 42 F.4th at 1193. Brunner produces evidence that GN Bank failed to engage in the interactive process. Callison forwarded Brunner's request to Kidwell who later said privately to Mathewson, "I am not planning on granting him rights to work from home. I think we have good reasons for that and some we cannot talk about to him." Doc. 60 at ¶ P33. Kidwell also told Mathewson that he believed Brunner would not get enough work done if he worked from home. Yet amidst all of these communications, there is no evidence that Kidwell or anyone else at GN Bank talked with Brunner to determine another accommodation.[7]

## B

Brunner also contends that he was terminated on the basis of his age in violation of the ADEA. Doc. 52 at ¶ 4.a.iii. GN Bank argues that Brunner does not present a prima facie case because he was not performing satisfactory work and has no evidence that he was replaced. Doc. 56 at 26–28. GN Bank's motion is denied because Brunner has

---

[7] GN Bank mentions that it provided Brunner a plexiglass barrier for his office, Doc. 63 at 98–99, which Brunner concedes, Doc. 60 at ¶ 33. Perhaps GN Bank means to argue that it granted Brunner a reasonable accommodation, but summary judgment is still not merited. For one thing, it is a new argument that was not contained in its opening brief. Arguments made for the first time on reply are not considered. *See, e.g.*, *United States v. Mannie*, 971 F.3d 1145, 1158 n.19 (10th Cir. 2020); *Black & Veatch Corp. v. Aspen Ins. (Uk) Ltd.*, 378 F. Supp. 3d 975, 989 (D. Kan. 2019). Even so, it is not entirely clear that—under the circumstances—this was a reasonable accommodation for Brunner.

shown a genuine dispute of material fact as to his prima facie case and pretext.

An ADEA claim brought with circumstantial evidence proceeds through the *McDonnell Douglas* framework. *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 968–69 (10th Cir. 2017). A plaintiff's prima facie case for age discrimination must show that he was "within the protected class of individuals 40 or older," "performing satisfactory work," "terminated from employment," and "replaced by a younger person, although not necessarily one less than 40 years old." *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1056 (10th Cir. 2020) (citation omitted). The evidence underlying the prima facie case must be "adequate to create an inference that the adverse employment decision *was*, in fact, motivated by plaintiff's age." *Adamson v. Multi Cmty. Diversified Servs., Inc*, 514 F.3d 1136, 1146 (10th Cir. 2008).

GN Bank argues first that Brunner cannot establish a prima facie case because the record shows that he was not performing satisfactory work. Doc. 56 at 27–28. At the prima facie stage, Brunner need only "introduc[e] some evidence of good performance." *Denison v. Swaco Geolograph Co.*, 941 F.2d 1416, 1420 (10th Cir. 1991). Despite the undisputed decline in his evaluation scores, Brunner has produced evidence that his work became satisfactory. He offers Boswell's statement that Brunner had complied with the requirements of the Personal Improvement Plan at the close of the 30-day probation period. Doc. 60 at 60 (citing Doc. 60 at ¶ P96). That is sufficient to create a genuine factual dispute as to whether Brunner's work was satisfactory for purposes of the prima facie case. *Denison*, 941 F.2d at 1420 (recognizing the burden at the prima facie case is low given the structural work done by the shifting burdens of the *McDonnell Douglas* framework).

GN Bank next argues that Brunner's prima facie case fails because he was not replaced. Doc. 56 at 28. It contends that it chose simply to eliminate his position entirely and no one could or did fill a position it made specifically for Brunner. *Id.* A jury could conclude that. But Brunner raises facts from which a jury could also conclude that he was replaced. Kidwell made comments about getting "young blood" in the bank, hired two employees in their twenties that held job duties similar to Brunner (one even holding the same job title), and later commented that Brunner's health conditions could deteriorate as he grew older. GN Bank seems to assert that hires made prior to a termination can never be considered a replacement, but it has not identified any controlling (or persuasive) precedent in support of that assertion. Brunner has raised a genuine dispute that GN Bank's hire of two younger

employees with similar job duties to Brunner could constitute a re-
placement, especially in light of Kidwell's age-related comments.

Overcoming GN Bank's challenge to his prima facie elements ef-
fectively sends this issue to a jury. For the same reasons stated above,
GN Bank has met its burden of showing a legitimate nondiscrimina-
tory reason for its termination decision, *see supra* Part II.A.1.b., and
Brunner's pretext arguments apply with the same force here, *see supra*
Part II.A.1.c.

GN Bank attempts to resist that conclusion by invoking the "same-
actor inference" to undermine Brunner's ADEA claim.[8] But that infer-
ence has been sufficiently rebutted by Brunner's evidence that Kid-
well's attitude toward his age changed during Brunner's employment,
dispelling that inference against discriminatory motivation.

When an employee is hired and fired by the same person within a
relatively short time span, there is a strong inference that the em-
ployer's reason for an adverse employment action is not pretextual.
*Antonio*, 458 F.3d at 1183. Terms of employment ranging from eight
days to four years have been found short enough for the inference to
apply. *Id.* at 1183 n.4 (collecting cases). Yet even if the inference ap-
plies, a plaintiff may present countervailing evidence of pretext to dis-
pel the inference against discriminatory motivation. *Id.* at 1183.

GN Bank has shown that the inference applies here. Kidwell knew
Brunner was 61 years old when he hired him and made the termination
decision only 18 months into Brunner's employment. That is enough
to infer that age discrimination was not Kidwell's motivation in termi-
nating Brunner's position. *Id.*

But viewing the evidence in the light most favorable to Brunner,
there is evidence that, if believed, could dispel the same-actor infer-
ence. Brunner points to Kidwell's "young blood" comment and his
comment about how Brunner's health may deteriorate as he ages to
support his argument that Kidwell's view of Brunner's age changed
over the course of Brunner's employment. Doc. 60 at 60. Because all
doubts concerning pretext are resolved in Brunner's favor, *Jencks v.
Modern Woodmen of Am.*, 479 F.3d 1261, 1267 (10th Cir. 2007), a jury

---

[8] GN Bank presents the same-actor inference as an argument against Brun-
ner's prima facie case. *See* Doc. 56 at 28. But that inference does not relate to
the prima facie case, *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183 (10th
Cir. 2006), so it is only considered here in relation to pretext.

could find, despite the same-actor inference, that GN Bank's proffered reason is pretext for discrimination. *See Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019).

## C

Brunner next contends that he was "harassed" and suffered discrimination because of his sex in violation of Title VII. Doc. 52 at ¶ 4.a.iv. GN Bank only briefly argues that it did not intentionally discriminate against Brunner because of his sex. Doc. 56 at 28–29. It does not appear that Brunner's brief in opposition even mentions the Title VII discrimination claim.

Rule 56(c) imposes an "initial responsibility" on a party seeking summary judgment to show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *accord Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016). To do that, "a party seeking summary judgment must show the law and available evidence compel the requested outcome" including "necessarily identify[ing] governing legal principles." *Davilla v. Enable Midstream Partners L.P.*, 913 F.3d 959, 968 (10th Cir. 2019) (citations omitted). Only if the moving party satisfies its initial burden does the non-moving party bearing the ultimate burden of proof at trial have an obligation to set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 256-57 (1986); *accord Savant Homes*, 809 F.3d at 1137. GN Bank's motion fails to satisfy this initial burden because it has not shown that it is entitled to judgment as a matter of law.

GN Bank's principal argument against Title VII liability is to argue that it did not intentionally discriminate against Brunner because of his sex.[9] Doc. 56 at 28–29. It then cites the Supreme Court's statement in *Bostock v. Clayton County*, 140 S. Ct. 1741 (2020), that "[f]or an employer to discriminate against employees for being homosexual . . . the employer must intentionally discriminate against individual men and women in part because of sex." Doc. 56 at 28 (citing *Bostock*, 140 S. Ct. at 1743). But as noted, Brunner relies exclusively on circumstantial evidence to support his claims of intentional discrimination. And under the *McDonnell Douglas* framework, Brunner must prove each element

---

[9] GN Bank also argues in passing that the same-actor inference applies. Doc. 56 at 29. But that inference, as previously noted, has been sufficiently rebutted to survive summary judgment. *See supra* Part II.B.

of his prima facie case to establish an inference of discrimination. *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1215 (10th Cir. 2022). GN Bank advances no argument that Brunner cannot state a prima facie case for discrimination on the basis of sex. As a result, GN Bank has not discharged its initial obligation to show that it is entitled to judgment as a matter of law. Thus, summary judgment is inappropriate. *See Davilla*, 913 F.3d at 968.

### D

Brunner also contends that GN Bank retaliated against him in violation of the ADA, ADEA, and Title VII because he opposed discrimination in his employee survey and requested a reasonable accommodation. Doc. 52 at ¶ 4.a.ii., iv., and vi. GN Bank seeks summary judgment as to the retaliation claims on the basis that there is insufficient evidence to support a prima facie case. Brunner fails to raise a genuine factual dispute over his prima facie case for Title VII retaliation, but summary judgment is denied as to his ADEA and ADA retaliation claims.

Where direct evidence of retaliation is lacking, the *McDonnell Douglas* framework again provides the relevant framework. *Ford*, 45 F.4th at 1224 (Title VII); *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1209 (10th Cir. 2018) (ADA); *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 638 (10th Cir. 2012) (ADEA). To establish a prima facie case, a plaintiff must show that he engaged in protected opposition to discrimination, a reasonable employee would have found his employer's subsequent action to be materially adverse, and a causal connection exists between his protected activity and the employer's action. *E.g.*, *Ford*, 45 F.4th at 1224.

**1.** With regard to Brunner's prima facie case, GN Bank makes two principal arguments. It contends that neither did Brunner engage in protected conduct under the ADEA or Title VII,[10] nor was there a causal connection between the survey and an adverse employment action. *Id.* at 30–35.

**a.** GN Bank's argument that Brunner did not engage in protected conduct has mixed success: Brunner's response to the Harassment and Discrimination survey in which he describes age-related discrimination is sufficient for purposes of his ADEA retaliation claim, but that

---

[10] The Bank makes no argument as to whether Brunner engaged in protected conduct under the ADA. *See* Doc. 56 at 30–34.

survey response fails to constitute protected conduct for purposes of Title VII because it does not identify any conduct that could reasonably be construed as sex discrimination. GN Bank claims that Brunner's only protected conduct under the ADEA is submitting a survey that generally stated that Pralle, a co-worker, had made comments about his advanced age. Doc. 56 at 30–31. That is insufficient as a matter of law, the argument continues, because there is no information about when she made the comment or what exactly she said. But uncontroverted facts provide the very context GN Bank contends is missing: Brunner's response to GN Bank's Harassment and Discrimination survey stated that he had been discriminated against on the basis of age, disability, and sex, identified Pralle as the culprit, and described her behavior of "loudly complaining to most of the staff about my advanced age and infirmity," and how that behavior led to him experiencing "a poisonous atmosphere with several staff members not speaking to me because of [Pralle.]" Doc. 60 at ¶¶ 26 & 27. This is sufficient to constitute protected activity for purposes of a retaliation claim. *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008).

GN Bank's contrary authority, an unpublished Tenth Circuit decision, is inapposite. Doc. 56 at 30-31 (citing *McElroy v. Am. Family Ins.* 630 F. App'x 847, 851 (10th Cir. 2015)). The plaintiff in *McElroy* argued on appeal (though evidently not before the district court) that his complaints to co-workers constituted engaging in protected conduct. *McElroy*, 630 F. App'x at 850 (noting "complaints to AFI employees" without specifying what those communications concerned). The Tenth Circuit concluded the district court had not erred in failing to consider these complaints because the appellate brief did not identify what was said or specify whether the alleged discrimination implicated gender, religion, or age. *McElroy*, 630 F. App'x at 851. There is no similar uncertainty here: Brunner's survey response alleged unlawful employment discrimination and provided a paragraph describing the offending conduct. Doc. 60 at ¶¶ 26–27.

Brunner's Title VII retaliation claim, however, fails. As GN Bank accurately describes, Doc. 56 at 31–34, Title VII prohibits sexual harassment to the extent that it creates a hostile work environment and changes the terms and conditions of employment. *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 891 (10th Cir. 2018). But isolated incidents of objectionable comments, unless those comments are extremely serious, "will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (quoting *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998)). While Brunner does not need to show that he reported an

actual Title VII violation, he must establish that he had "a reasonable good-faith belief" that he was opposing unlawful Title VII discrimination. *Fassbender*, 890 F.3d at 890.

Brunner could not have had a reasonable, good-faith belief that his survey response reported conduct forbidden by Title VII. The sole basis of his claim is that Pralle, outside the presence of Brunner, had made a comment to another co-worker about that co-worker's dog being "gay for the stay" and then contacting Brunner to report what she had said and to apologize for it. Doc. 60 at ¶¶ 18-21. Accepting that the comment was offensive, this single isolated statement from a co-worker is neither unlawful nor would it give Brunner a reasonable, good-faith basis to believe he was opposing an unlawful employment practice.[11] *Breeden*, 532 U.S. at 271 (holding that "no person" could have believed that a single sexually explicit comment violated Title VII's standards in part because it was an "'isolated inciden[t] that cannot remotely be considered 'extremely serious'"); *see also Reznik v. inContact, Inc.*, 18 F. 4th 1257, 1262 (10th Cir. 2021) (discussing *Breeden*'s reasonableness standard).

**b.** GN Bank further argues that there is no causal connection between Brunner's survey response and an adverse employment action.[12]

---

[11] Brunner argues that he expressed a concern that Pralle may someday be given supervisory authority over him. Doc. 60 at 62. But aside from this passing comment, Brunner has not explained how that concern might somehow constitute protected opposition to Title VII discrimination or offered any authority in support of such a claim.

[12] GN Bank asserts, without discussion, that the Personal Improvement Plan was not an adverse employment action. Doc. 56 at 33–35. Although the Bank may be right, it fails to demonstrate how as a matter of law. For an employment action to be adverse, an "employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Payan v. United Parcel Serv.*, 905 F.3d 1162, 1172 (10th Cir. 2018) (quoting *Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). A Personal Improvement Plan "may be an adverse employment action . . . if it effects a significant change in the plaintiff's employment status." *Ford,* 45 F.4th at 1226 (quoting *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1224 (10th Cir. 2006)). GN Bank fails to show that the Personal Improvement Plan did not substantially affect Brunner's employment. *See* Doc. 56 at 35. There is some evidence that it did—the terms of the Plan warned Brunner that he could be terminated for not meeting his goals. GN Bank has not established why that is insufficient to constitute an adverse action in this case.

Doc. 56 at 34-36. "To establish a causal connection, a plaintiff must 'present evidence of circumstances that justify an inference of retaliatory motive.'" *Bekkem v. Wilkie*, 915 F.3d 1258, 1271 (10th Cir. 2019) (quoting *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014)). An adverse action may imply a causal connection if it occurs within three months of the protected conduct. *Id.* (citation omitted). But if more than three months elapse, "a plaintiff must present other evidence—'more than mere speculation, conjecture, or surmise'—to establish that [his] protected activity was a but-for cause of the adverse employment action." *Id.* (quoting *Ward*, 772 F.3d at 1203). A plaintiff may show, for example, that an employer took actions in close relation to protected activity, resulting in an adverse employment action taken at a later date. *See Marx v. Schnuck Mkts., Inc.*, 76 F.3d 324, 329 (10th Cir. 1996).

Although the Personal Improvement Plan was imposed three months after the survey, followed by the termination decision four months after that, there is sufficient evidence, when viewed in the light most favorable to Brunner, to create a question of fact as to whether either action was causally connected to Brunner's survey response. For one thing, Brunner reports that Kidwell met with him shortly after the survey was submitted and described Kidwell as visibly angry, red-faced, with eyes bugging out, yelling at him that the bank had not ever had a complaint of discrimination in its 100-year history, and then claiming there would be no retaliation. A reasonable jury may infer that the promise that there would be no retaliation was a hollow one. In the months following that meeting, GN Bank began forming a Personal Improvement Plan, but did not impose it until three months after receiving the complaint. Again, this, along with the evidence suggesting that the concern for how Kidwell's message might be conveyed and shifting explanations for the decision to terminate, may lead a reasonable jury to conclude retaliation was the motivator. Further, GN Bank tasked employees to watch over Brunner's performance, and then eliminated his position four months later. A reasonable jury may believe that GN Bank orchestrated its response to Brunner's survey in a way to effect termination while obfuscating its retaliatory motive. *See Marx*, 76 F.3d at 329.

**2.** Again, this effectively ends the inquiry and sends the issue to a jury. GN Bank has met its burden of showing a legitimate nondiscriminatory reason for its termination decision, *see supra* Part II.A.1.b., and Brunner's pretext arguments are sufficient to establish pretext, *see supra* Part II.A.1.c. Therefore, summary judgment is denied as to Brunner's ADEA and ADA retaliation claims.

## E

Among other forms of relief, Brunner seeks compensatory damages for emotional distress and punitive damages. Doc. 52 at ¶ 5.a.vi.–vii. GN Bank argues that it is entitled to summary judgment because Brunner cannot recover compensatory emotional damages or punitive damages for his ADEA discrimination and ADEA and ADA retaliation claims. Doc. 56 at 41. Brunner points out that nothing in the Pretrial Order indicates that he seeks those damages specifically for those claims but maintains nonetheless that they are available. Doc. 60 at 73. GN Bank's motion is granted.

The Tenth Circuit prohibits recovery of either compensatory or punitive damages for an ADEA discrimination claim. *Villescas v. Abraham*, 311 F.3d 1253, 1259, 1261 (10th Cir. 2002). In *Perrell v. Financeamerica Corp.*, 726 F.2d 654 (10th Cir. 1984), the Tenth Circuit held that the scope of available damages under the ADEA is limited to those statutorily enumerated in 29 U.S.C. § 626, which does not list compensatory damages for emotional distress. *Id.* at 657. And in *Bruno v. Western Electric Co.*, 829 F.2d 957 (10th Cir. 1987), the Tenth Circuit held that punitive damages are not available under the ADEA because they would constitute double recovery alongside statutorily authorized liquidated damages for willful violations and would detract from the ADEA's conciliatory aim. *Id.* at 966–67.

Although the Tenth Circuit has not decided whether those damages are available for retaliation claims under the ADEA or ADA, well-reasoned authorities conclude that they are not. In *Marshall v. BNSF Railway Co.*, No. 18-cv-2385, 2020 WL 128054 (D. Kan. Jan. 10, 2020), Judge Lungstrum considered whether a plaintiff could recover compensatory emotional damages and punitive damages for an ADEA retaliation claim. That decision identified a circuit split, with the Seventh Circuit holding that those damages are available for ADEA retaliation claims, *id.* at *3 (citing *Moskowitz v. Trs. of Purdue Univ.*, 5 F.3d 279, 283–84 (7th Cir. 1993)), and the Fifth Circuit holding that they are not, *id.* (citing *Vaughan v. Anderson Reg'l Med. Ctr.*, 849 F.3d 588, 592 (5th Cir. 2017)). After reviewing the textual basis for the rulings, Judge Lungstrum predicted that the Tenth Circuit, if faced with the question, would decline to permit such damages in an ADEA retaliation claim. *Marshall*, 2020 WL 128054 at *4 (relying on several district court decisions outside the Seventh Circuit, including a prior District of Kansas decision).

Brunner has not established that the Tenth Circuit would reach a contrary conclusion. He argues that compensatory and punitive

damages are available under that statute because it permits courts to "grant such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter." Doc. 60 at 73 (citing 29 U.S.C. § 216(b)).[13] But the Tenth Circuit considered similar language in section 626 and found that it did not permit recovery of compensatory and punitive damages for ADEA discrimination claims. *Perrell*, 726 F.2d at 657; *Bruno*, 829 F.2d at 967. And there is no reason to treat retaliation claims differently. *See Marshall*, 2020 WL 128054, at *4; *Vaughan*, 849 F.3d at 591–92.

As for ADA retaliation claims, the damages provisions applicable to those claims do not  authorize compensatory or punitive damages either. There appears to be no Tenth Circuit authority, but district courts in Kansas have long held that such relief is not available. *Boe v. AlliedSignal Inc.*, 131 F. Supp. 2d 1197, 1202 (D. Kan. 2001); *Sink v. Wal-Mart Stores, Inc.*, 147 F. Supp. 2d 1085, 1101 (D. Kan. 2001). And that is also the considered view in other circuits, too. *Kramer v. Banc of America Securities, LLC*, 355 F.3d 961 (7th Cir. 2004); *Alvarado v. Cajun Operating Co.*, 588 F.3d 1261, 1269–70 (9th Cir. 2009) (adopting *Kramer*'s reasoning). In the absence of controlling authority to the contrary, these decisions appear to hew more closely to the plain text of the remedial provisions enacted by Congress. And Brunner makes no argument to the contrary.

### III

For the foregoing reasons, GN Bank's motion for summary judgment is granted in part and denied in part. It is GRANTED as to Brunner's Title VII retaliation claim and to bar compensatory and punitive damages for Brunner's ADEA discrimination and ADEA and ADA retaliation claims. It is DENIED in part as to his ADA, ADEA, and Title VII discrimination claims and his ADEA and ADA retaliation claims.

It is so ordered.

Date: March 13, 2023                   _s/ Toby Crouse_____
                                       Toby Crouse
                                       United States District Judge

---

[13] Brunner cites the remedial provision of the Fair Labor Standards Act, which is materially identical to the language of the ADEA. *Compare* 29 U.S.C. § 216(b) *with* 29 U.S.C. § 626(b).